UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   X

| | | |
|---|---|---|
| QUADRO PARTNERS, INC., | : | No. _____ |
| Plaintiff, | : | |
| v. | : | **COMPLAINT** |
| RAJNESH SINGH, | : | |
| Defendant. | : | **JURY TRIAL DEMANDED** |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   X

Plaintiff Quadro Partners, Inc. ("Cadre" or the "Company"), by and through its attorneys Cooley LLP, complains and alleges against Defendant Rajnesh Singh ("Mr. Singh") as follows:

## I.    INTRODUCTION

1.    This action seeks to enforce restrictive covenants and invention assignment obligations that Mr. Singh agreed to when he accepted a high-level position at Cadre. In resigning from Cadre, Mr. Singh announced that it was his intent to develop and promote a real estate software product similar if not identical to the real estate software product he developed at Cadre. This is in flagrant disregard of his covenants and obligations to Cadre, and would also involve misappropriation of some of Cadre's most valued trade secrets. Accordingly, Cadre seeks injunctive relief prohibiting Mr. Singh from competing against Cadre in the very territory in which he was recently employed, from using and commercializing the unique real estate knowledge and know-how he acquired during his tenure at Cadre, and from using and commercializing the real estate software and software enhancements that he helped develop during his employment at Cadre.

2.    Cadre is an industry leader in the field of technology-driven real estate investing. Cadre has created a sophisticated software product that curates and standardizes asset-level real

estate data and overlays it with market-level data so that Cadre and its clients can better understand asset value, pricing, and buy/sell opportunities in the real estate investment and ownership market.

3. Mr. Singh joined Cadre's executive management team in October 2017 for the specific purpose of accelerating the development of Cadre's unique and proprietary software. Specifically, as the Director of Product and Head of Canada, Mr. Singh had access to and leveraged Cadre's existing work product, Cadre's existing research, and Cadre's active and extensive network of real estate owners, investors, advisors, and professionals to further refine Cadre's software.

4. In late August 2018, Mr. Singh abruptly resigned and advised Cadre of his immediate plan to develop "his own" real estate software product. Mr. Singh made this announcement after having immersed himself in Cadre's confidential and proprietary work product and trade secrets for nearly one year.

5. Cadre has repeatedly sought assurances from Mr. Singh and his attorney that Mr. Singh does not plan to carry out his announced plan and thereby breach his agreements with Cadre. Mr. Singh has resolutely dismissed Cadre's concerns and is moving full speed ahead.

6. Mr. Singh's violation of his restrictive covenants and other contractual obligations puts Cadre's confidential and proprietary information, trade secrets, and business plans in immediate jeopardy.

II. THE PARTIES

7. Cadre is a corporation organized and existing under the laws of the state of Delaware, with its principal place of business in New York, New York.

8. Mr. Singh was the Director of Product and Head of Canada at Cadre in Canada from October 2017 through August 2018.

### III.    JURISDICTION AND VENUE

9.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332.    Cadre is incorporated in the state of Delaware, with its principal place of business in New York, New York. Mr. Singh currently resides in Canada. The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

10.    This Court further has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3) as this matter presents a federal question.  This Court has supplemental jurisdiction over Cadre's state law claims under 28 U.S.C. § 1367(a).

11.    This Court has personal jurisdiction over Mr. Singh because, pursuant to the Employee Inventions and Proprietary Information Agreement he entered into with Cadre on September 20, 2018 ("IPIA"), Mr. Singh expressly submitted to the jurisdiction of this Court.

12.    Venue is proper in this District because Cadre has its headquarters here and certain key acts alleged herein occurred in this District.  Additionally, Mr Singh consented to this venue in the IPIA.

### IV.    FACTUAL ALLEGATIONS

#### A.    Cadre's Business and its Proprietary Software

13.    Cadre is an industry leader in technology-driven real estate investing.    The Company has a real estate portfolio totaling approximately $1.3 billion and a team of investment professionals whose real estate investment deals collectively total over $45 billion.

14.    From its inception in 2014, Cadre began using its own proprietary technology solutions to enhance its real estate investment activity.  Specifically, Cadre relies on a highly coordinated internal team of investment professionals and data analysts that convert disaggregated real estate property data into a set of well-defined, uniform and standardized data points.  The standardized data allows Cadre to track the performance of its existing real estate properties and

evaluate potential investments in new properties. These methods for data curation and standardization are among Cadre's most valued trade secrets and give Cadre its competitive edge.

15. In addition to building and maintaining its own portfolio, Cadre also curates and standardizes data for other real estate industry participants, whom it includes among its clients. A range of real estate operators and investors, including entities as well as individual professionals, use Cadre's standardized asset data and proprietary software to (i) track properties they own in a systematic manner, and (ii) overlay their property data with market-level data to better understand value, pricing, and buy/sell opportunities. This solution is especially valuable to real estate investors who do not operate their own properties and thus have less ability to control the quality of data collection with respect to those properties. Investors may receive data from a variety of different operators who use different metrics, and Cadre's system and software enables the standardization of such data.

16. Cadre also creates asset reports for investors about potential properties for sale. Given the industry's lack of uniform practices, a key value add of Cadre's technology is that it describes all real estate opportunities according to consistent metrics and in a standardized manner, so that every real estate market participant has access to the same information. The uniformity of Cadre's property data creates efficiencies and cost savings for all industry participants.

17. Because Cadre's curation and standardization of data is extremely labor intensive, the Company has invested in the development of its own software product to help streamline the process. Cadre has developed and has recently begun marketing an Internet-based version of its software for use by outside investors and operators.

18. Once integrated in Cadre's database, outside investors and operators gain access to Cadre's management tools and to reports overlaying market-level data.

4

19.     To develop and refine its software, Cadre has invested in thousands of hours of research and collaboration among the Company's data engineers, software engineers, product managers, compliance and operations professionals and finance team.

**B.     Measures Taken by Cadre to Secure Its Confidential and Proprietary Work and Trade Secret Information.**

20.     Cadre uses an array of measures to maintain the secrecy of its confidential and proprietary work product and trade secret information, including information related to its software.

21.     Cadre has nondisclosure agreements with all of its employees, contractors, vendors, suppliers, and business partners.  Specifically, Cadre's written employment policy signed by Mr. Singh and discussed further below, specifically addresses confidentiality of proprietary information.

22.     Cadre also uses physical security measures to protect its confidential and proprietary work product and trade secret information, such as restricting entry into Company facilities.

23.     Cadre tightly controls access to its electronic systems. Cadre's proprietary database of private company information, and access to its computer systems, are password-protected. Cadre also employs strict geographic restrictions, where certain functionality in Cadre's databases is only accessible to employees physically stationed in Cadre's offices.  Cadre employees are not permitted to disclose their passwords to anyone else.  Cadre also employs other electronic security measures such as disk encryption and firewalls.

24.     Cadre requires that its employees return or destroy confidential and proprietary work product and trade secret information upon their departure from the Company.

25. Cadre's confidential and proprietary work product and trade secret information concerning Cadre's software creates a competitive advantage for Cadre. If a competitor impermissibly obtained or misappropriated Cadre's confidential and trade secret information, the competitor could, without investing the significant time and effort expended by Cadre, gain an unlawful and unfair advantage over Cadre. Alternatively, even if such information were used by a non-competitive entity, such entity would be unjustly enriched by the fruits of Cadre's labor.

**C.     Mr. Singh Joins Cadre**

26. Cadre hired Mr. Singh as Cadre's Director of Product and Head of Canada in October of 2017. Mr. Singh's official onboarding documentation specifically noted that by the one-year anniversary of his employment, Cadre planned to launch software with functionality that would automate data collection, curate and standardize asset level data, and allow real estate owners to list their owned assets on the Cadre platform.

**D.     Mr. Singh's IPIA with Cadre**

27. To protect the Company's confidential and proprietary work product and trade secret information, Cadre required Mr. Singh to sign the IPIA at the commencement of his employment with Cadre. This agreement includes provisions that assign all inventions to Cadre, require Mr. Singh to maintain Cadre's proprietary information in strict confidence, and prohibit him from competing against Cadre.

28. Cadre would not have provided Mr. Singh with access to its confidential and proprietary work product and trade secret information, or employed Mr. Singh in any capacity, had he not signed the IPIA.

29. In §2.b of the IPIA, Mr. Singh agreed to assign all inventions to Cadre (hereinafter "Invention Assignment Provision"):

Assignment. The Company shall own, and I hereby assign and agree to assign, all right, title and interest in and to all Inventions (including all Intellectual Property Rights therein, related thereto or embodied therein) that are collected, made, conceived, developed, reduced to practice or set out in any tangible medium of expression or otherwise created, in whole or in part (collectively "Created"), by me during the term of my employment with the Company that either (i) arise out of any use of the Company's facilities, equipment, Proprietary Information or other assets (collectively "Company Assets") or any research or other activity conducted by, for or under the direction of the Company (whether or not conducted (A) at the Company's facilities; (B) during working hours or (C) using Company Assets), or (ii) are useful with or in or relate directly or indirectly to any Company Interest. I will promptly disclose and provide all of the foregoing Inventions (the "Assigned Inventions") to the Company...

IPIA, §2.b

30.    As relevant to the foregoing Invention Assignment Provision, Mr. Singh agreed to the following definitions in the IPIA:

"Company Interest" means any of the Company's current and anticipated business, research and development, as well as any product, service, other Invention or Intellectual Property Rights (defined below) that is sold, leased, used, licensed, provided, proposed, under consideration or under development by the Company.

"Intellectual Property Rights" means any and all patent rights, copyright rights, trademark rights, mask work rights, trade secret rights, sui generis database rights and all other intellectual and industrial property rights of any sort throughout the world (including any application therefor and any rights to apply therefor, as well as all rights to pursue remedies for infringement or violation thereof).

"Invention" means any idea, concept, discovery, learning, invention, development, research, technology, work of authorship, trade secret, software, firmware, content, audio-visual material, tool, process, technique, know-how, data, plan, device, apparatus, specification, design, prototype, circuit, layout, mask work, algorithm, program, code, documentation or other material or information, tangible or intangible, and all versions, modifications, enhancements and derivative works thereof, whether or not it may be patented, copyrighted, trademarked or otherwise protected.

IPIA, §2.a.

31.    In §3.a of the IPIA, Mr. Singh agreed to hold in strict confidence and not to directly or indirectly disclose or use any of Cadre's proprietary information (hereinafter "Non-Disclosure Provision"):

> I agree that all Assigned Inventions (and all other financial, business, legal and technical information regarding or relevant to any Company Interest that is not generally publicly known), including the identity of and any other information relating to the Company's employees, Affiliates and Business Partners (as such terms are defined below), that I develop, learn or obtain during my employment or that are received by or for the Company in confidence, constitute "Proprietary Information." I will hold in strict confidence and not directly or indirectly disclose or use any Proprietary Information, except as required within the scope of my employment. My obligation of nondisclosure and nonuse of Proprietary Information under this Section shall continue until I can document that it is or becomes readily generally available to the public without restriction through no fault of mine (including breach of this Agreement) or, if a court requires a shorter duration, then the maximum time allowable by law will control.

IPIA, §3.a.

32.    Mr. Singh further agreed to refrain from competing with the Company for a period of twelve months after the termination of his employment (hereinafter "Non-Competition Provision"):

> For the period of twelve (12) months immediately following my termination of employment with the Company (for any or no reason, whether voluntary or involuntary), I will not directly or indirectly . . . engage in any Competitive Activities (I) anywhere the Company offers its services or has customers during my employment with the Company or where my use or disclosure of Proprietary Information could materially disadvantage the Company regardless of my physical location; or (II) anywhere the Company offers its services or has customers and where I have responsibility for the Company or (III) anywhere within a fifty (50) mile radius of any physical location I work for the Company. The foregoing timeframes shall be increased by the period of time beginning from the commencement of any violation of the foregoing provisions until such time as I have cured such violation.

IPIA, §4.b.v.d

33.    As relevant to the foregoing Non-Competition Provision, Mr. Singh agreed that Competitive Activities from which he was precluded included activities "related to [or] substantially similar to" the Company's active or "demonstrably planned interests:"

> "Competitive Activities" means any direct or indirect non-Company activity (i) that is the same or substantially similar to Employee's responsibilities for the Company that relates to, is substantially similar to, or competes with the Company (or its demonstrably planned interests) at the time of Employee's termination from the Company; or (ii) involving the use or disclosure, or the likelihood of the use or disclosure, of Proprietary Information.

8

Competitive Activities do not include being a holder of less than one percent (1%) of the outstanding equity of a public company.

IPIA, §4.a

### E.    Mr. Singh's Access to Cadre's Confidential and Proprietary Work Product and Trade Secret Information

34.    In his role as Director of Product and Head of Canada, Mr. Singh was one of the highest-ranking managers at Cadre.  As such, and in reliance upon the IPIA Mr. Singh signed, Cadre gave Mr. Singh unfettered access to its confidential information, trade secrets, work product, business plans, and its wealth of real estate industry contacts and resources related to Cadre's software.

35.    While helping refine Cadre's software, Mr. Singh spent significant time learning about Cadre's business and about aspects of the real estate investment industry through Cadre's executives, including the Head of Asset Management and the Managing Director of Investments. In February 2018, Cadre elevated Mr. Singh to its Executive Committee, where Mr. Singh obtained exposure to the Company's strategic discussions about the Company's market strategy for Cadre's software.

36.    Cadre introduced Mr. Singh to numerous real estate owners, including a range of operators and investors with whom Cadre had developed decades-long relationships.  Mr. Singh conducted at least fifteen research and product development meetings with these large real estate owners.

37.    Mr. Singh also obtained access to Cadre's confidential and proprietary work product and trade secret information by taking advantage of Cadre's other resources.  For instance, Mr. Singh utilized Cadre's artificial intelligence external contractor who developed a complex algorithm to automate data collection, curation and standardization for Cadre's software.

Similarly, Mr. Singh worked with a consulting firm retained by Cadre to better understand the product preferences of the real estate investors who would be key users of Cadre's software.

**F.      Mr. Singh Resigns from Cadre and Threatens to Start His Own Company**

38.      On August 8, 2018, Mr. Singh notified the Company that he planned to leave Cadre to develop and promote his own real estate software product.  Mr. Singh told the Company's CEO that he intended to develop a software product for real estate owners to better underwrite transactions and perform more thorough asset management and portfolio analysis of properties—a solution that is virtually identical to the software Mr. Singh helped develop and refine for Cadre.

39.      Mr. Singh specifically stated that his intended product would serve real estate institutions including entities that have used, worked with, or explored partnerships with Cadre and are among Cadre's target market for Cadre's software.

40.      In presenting his planned business to Cadre, Mr. Singh provided written materials that clearly betrayed the extent to which he was relying on information he obtained at Cadre.  His materials cut and pasted from Cadre's software specifications, value proposition, and business plan for its own software product.

41.      Indeed, on June 7, 2018, Mr. Singh surreptitiously sent an e-mail from his Cadre e-mail account to his personal e-mail account describing a "Product X" that had functionality nearly identical to the Cadre's software.

42.      Mr. Singh resigned from Cadre on August 14, 2018.  Cadre, through legal counsel and by letter dated August 17, 2018, alerted Mr. Singh that Cadre would not permit him to breach his contractual obligations to Cadre, steal Cadre's intellectual property, or otherwise create real estate-related software.  To date, Mr. Singh has expressly refused to provide assurances that he will not develop or otherwise commercialize real estate-related software, including software similar if not identical to the software be helped develop at Cadre.

**G.    Cadre Discovers That Mr. Singh Misappropriated Company Contracts, Ideas, and Materials**

43.    Upon Mr. Singh's departure from Cadre, Cadre discovered that Mr. Singh forwarded various e-mails to his personal e-mail account that include Cadre's confidential corporate e-mails, Google documents, spreadsheets, presentations, and chat messages among employees.    He also forwarded highly confidential e-mails among Company management containing details about real estate properties and deals, and information about the Company's business partners, platform, and financials.

44.    On his last day of employment, Mr. Singh brazenly requested from a junior-level employee copies of all of Cadre's investor on-boarding agreements, which are password-protected, non-public legal agreements that investors using Cadre services sign.

## FIRST CAUSE OF ACTION
Breach of Contract (IPIA)

45.    Plaintiff re-alleges and incorporates by reference each and every aforementioned allegation of this Complaint.

46.    The IPIA is a binding and enforceable contract that Mr. Singh signed at the outset of his employment with Cadre.    The terms of the IPIA are reasonable and necessary to protect Cadre's confidential and proprietary work product and trade secret information.

47.    Cadre has performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the IPIA.

48.    Mr. Singh unjustifiably and inexcusably breached the IPIA by surreptitiously forwarding Cadre documents and materials to his own personal email account, including documents that contain confidential and proprietary information.

11

49. Mr. Singh has threatened future breaches by announcing plans for his own software business that will entail misappropriation of Cadre's confidential and proprietary information and trade secrets, and that will also entail breach of his non-competition covenant.

50. Mr. Singh plans to continue to unjustifiably and inexcusably breach his obligations under the non-disclosure provision of the IPIA by disclosing Cadre's confidential and proprietary work product and trade secret information to individuals outside of Cadre, including employees and customers of Mr. Singh's own business.

51. Mr. Singh unjustifiably and inexcusably breached his obligations under the non-competition provision of the IPIA by engaging in competing business interests while employed by Cadre.

52. Cadre has suffered and continues to suffer damages, and also faces the imminent threat of irreparable harm, arising from Mr. Singh's multiple breaches of his IPIA.

53. Cadre is entitled to its costs and attorney's fees arising from Mr. Singh's multiple breaches of his IPIA.

## SECOND CAUSE OF ACTION
Violation of Defend Trade Secrets Act, 18 U.S.C. §§ 1832, 1836 *et seq.*

54. Plaintiff re-alleges and incorporates by reference each and every aforementioned allegation of this Complaint.

55. Cadre maintains and has maintained a vast amount of confidential and proprietary information and know-how concerning real estate investment, real estate investment analysis, the curation and standardization of real estate data, and business ideas and plans for real estate investment and related client activity. Cadre's trade secrets also include knowledge of its existing and prospective client base.

56. This confidential and proprietary work product and trade secret information relates, among other things, to Cadre's software and related services that are used, sold, shipped and/or ordered in, or intended to be used, sold, shipped and/or ordered in, interstate or foreign commerce.

57. Cadre has taken reasonable measures to keep such information secret and confidential.

58. Cadre has at all times maintained stringent security measures to preserve the secrecy of such information. Among other things, Cadre has nondisclosure agreements with employees, contractors, vendors, suppliers, and business partners. Cadre uses physical security measures such as restricted entry into Company facilities, and employs electronic security measures such as disk encryption, firewalls, and required password access. Cadre also requires that its employees return or destroy all confidential and proprietary work product and trade secret information upon their departure from the company. Mr. Singh signed an IPIA with Cadre, in which he agreed to the confidentiality and non-disclosure of Cadre's trade secrets.

59. Due to these security measures, Cadre's trade secrets are not available for others to use through any legitimate means.

60. Cadre's trade secrets derive independent value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

61. Mr. Singh misappropriated Cadre's trade secret information in the improper and unlawful manner alleged herein.

62. Mr. Singh's misappropriation of Cadre's trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive.

63.     On information and belief, if Mr. Singh is not enjoined, he will continue to misappropriate and use Cadre's trade secret information for his own benefit and to Cadre's detriment.

64.     Moreover, because of Mr. Singh's extensive knowledge of Cadre's trade secrets and the similarity of his own new business venture, Mr. Singh's use and misappropriation of Cadre's trade secrets is inevitable and subject to the doctrine of inevitable disclosure.

65.     As the direct and proximate result of Mr. Singh's conduct, Cadre will suffer and, if Mr. Singh's conduct is not enjoined, will continue to suffer, severe competitive harm, irreparable injury, and significant damages, in an amount to be determined at trial.

66.     Because Cadre's remedy at law is inadequate, it seeks, in addition to damages, preliminary and permanent injunctive relief to recover and protect its confidential and proprietary work product and trade secret information from further use or disclosure.

67.     Cadre is also entitled to an award of exemplary damages and recovery of its attorney's fees incurred herein.

### THIRD CAUSE OF ACTION
Trade Secret Misappropriation

68.     Plaintiff re-alleges and incorporates by reference each and every aforementioned allegation of this Complaint.

69.     Cadre has an array of proprietary trade secret information, as alleged herein.

70.     Cadre's confidential and proprietary trade secret information has independent economic value from not being generally known to the public and has provided Cadre with a legitimate commercial advantage over actual and would-be competitors. Cadre has made, and continues to make, diligent efforts to protect its confidential and proprietary work product and

14

trade secret information. Accordingly, such information constitutes "trade secrets" under New York law.

71. Cadre's current and former employees, including Mr. Singh, were under a common law and contractual duty to maintain in confidence Cadre's trade secrets and proprietary information, and not to use or disclose such information.

72. Upon information and belief, Mr. Singh has actually used or disclosed, and has threatened to use or disclose, Cadre's proprietary and trade secret information and has done so with knowledge. Mr. Singh's use or disclosure of such information has been and will continue to be in direct violation of his contractual obligations to Cadre, and in direct violation of New York law.

73. Mr. Singh has willfully and maliciously misappropriated and/or wrongfully used Cadre's trade secret information as described above, and continues to misuse the above-described trade secrets for purposes of personal gain and/or gaining a competitive advantage over Cadre.

74. Moreover, because of Mr. Singh's extensive knowledge of Cadre's trade secrets and the similarity of his own new business venture, Mr. Singh's use and misappropriation of Cadre's trade secrets is inevitable and subject to the doctrine of inevitable disclosure.

75. Upon information and belief, Mr. Singh has gained, or will gain, substantial benefit from his use of Cadre's trade secrets to Cadre's substantial detriment.

76. As a result of Mr. Singh's said unlawful conduct, Cadre's trade secret information has been threatened and/or compromised.

77. As a direct and proximate result of Mr. Singh's misappropriation of trade secrets, actual or threatened, Cadre has been damaged in an amount to be ascertained at trial.

78.    Unless enjoined by this Court, said misappropriation of trade secrets threatens to and will cause great and irreparable injury to Cadre, and Cadre has no adequate or other remedy at law for such acts and threatened acts.

79.    Because the above described conduct was willful, wanton, malicious and oppressive, Cadre is entitled to an award of exemplary and punitive damages against Mr. Singh in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### Violation of Faithless Servant Doctrine

80.    Plaintiff re-alleges and incorporates by reference each and every aforementioned allegation of this Complaint.

81.    Mr. Singh engaged in disloyal acts toward Cadre during his employment with Cadre, including by misappropriating Cadre's confidential and proprietary work product and trade secret information for his own personal benefit.

82.    Cadre only learned about these disloyal acts after Mr. Singh decided to terminate his employment at Cadre, and after Cadre compensated Mr. Singh during the periods of disloyalty.

83.    Cadre has suffered damages equal to the amounts of compensation, consideration, and other benefits paid to Mr. Singh during the periods of disloyalty.

## PRAYER FOR RELIEF

Plaintiff demands a trial by jury and respectfully requests that this Court:

A.    Enter a Preliminary Injunction order:

1.    Restraining and enjoining Mr. Singh, from directly or indirectly:

a.    Breaching the Invention Assignment Provision, Non-Disclosure Provision and Non-Competition Provision of his IPIA, including by developing and commercializing any real estate-related software;

16

b.      Offering or soliciting any Cadre client or potential client any business involving any product or service offered by Cadre, including, but not limited to, the sale of real estate-related software;

c.      Using, disclosing, or transmitting for any purpose (including but not limited to solicitation of clients) any of Cadre's confidential or proprietary work product or business information, including but not limited to the names, addresses, and specific information about Cadre's clients, pricing, data collection, research, and strategy related to Cadre's software; and

2.      Requiring Mr. Singh to return immediately to Cadre all originals, copies, or other reproductions, in any form whatsoever, of any document of Cadre, and (after preserving all materials in an appropriate manner for purposes of this litigation, including all metadata) to purge or destroy any computerized records Mr. Singh has within his possession, custody, or control;

B.      Enter a Permanent Injunction restraining and enjoining Mr. Singh from the conduct set forth in subparagraphs A(1)-A(2) above (including subparagraphs thereof), except that the Non-Disclosure Provision and Non-Competition Provision shall be extended by the period of Mr. Singh's noncompliance, such period of time equaling the length of time between the date Mr. Singh ceased complying with his IPIA and ending on the date of the Court's Permanent Injunction;

C.      Require Mr. Singh to reimburse Cadre for the costs it incurred in obtaining any and all relief in this action, including but not limited to, attorney's fees incurred by Plaintiff;

D.      Require Mr. Singh to repay all compensation and other consideration paid to him by Cadre, including wages, bonuses, and other benefits, while he was acting as a "faithless servant;"

E.      Award Cadre monetary damages in an amount to be determined at trial, including exemplary and punitive damages;

F.      Enter a declaratory judgment confirming that Cadre owns or shall own any software developed by Mr. Singh related to real estate data curation, standardization, or reporting for real estate owners, including operators and investors; and

G.      Grant Cadre such other and further relief as this Court deems just and proper.

Dated: October 10, 2018

Respectfully submitted,

COOLEY LLP

By: _____

Jonathan Bach
Gerard O'Shea
1114 Avenue of the Americas
New York, NY 10036
Telephone: (212) 479-6000

*Attorneys for Plaintiff*
*Quadro Partners, Inc.*

18