大成 DENTONS

**Lindsay F. Ditlow**
Counsel

lindsay.ditlow@dentons.com
D +1 212 398 5782

Dentons US LLP
1221 Avenue of the Americas
New York, NY 10020-1089
United States

dentons.com

**By ECF** November 14, 2018

The Honorable Jesse M. Furman
United States District Judge
Southern District of New York
40 Foley Square, Room 1105
New York, NY 10007

Re: *Quadro Partners, Inc. v. Rajnesh Singh, 1:18-cv-09281 (JMF)*

Dear Judge Furman:

This firm represents Defendant Rajnesh Singh ("Mr. Singh"). Mr. Singh is a former employee of Plaintiff's associated entity QP Operations Canada. As directed by the Court on November 9, 2018, Mr. Singh responds, in brief, as follows to Plaintiff's request for temporary restraining order and preliminary injunction ("TRO") scheduled for hearing on November 16, 2018.

**1. Jurisdictional Issues**

As an initial matter, Mr. Singh is a resident of Canada, his employment with Plaintiff took place in Canada, and the plain language of the parties' September 17, 2017 Employment Agreement governing the relationship between Plaintiff and Mr. Singh (tellingly omitted from Plaintiff's filings and attached hereto as Exh. A) sets forth the parties' agreement that any disputes relating to Mr. Singh's employment with Plaintiff are to be governed under Ontario law, and in the jurisdiction of the courts of Toronto, Ontario:

> The terms of this letter agreement and the resolution of any disputes as to the meaning, effect, performance or validity of this letter agreement **or arising out of, related to, or in any way connected with, this letter agreement, your employment with the Company or any other relationship between you and the Company** (the "Disputes") will be governed by Ontario law, excluding laws relating to conflicts or choice of law. You and the Company submit to the **exclusive personal jurisdiction of courts located in Toronto, Ontario in connection with any Dispute or any claim related to any Dispute**.

Employment Agreement, § 8 (emphasis added).

Accordingly, Mr. Singh is not subject to the personal jurisdiction of this Court and New York law does not apply to this dispute.[1] Plaintiff's attempt to bring claims relating to Mr. Singh's employment in a New York court under New York and United States laws constitutes impermissible forum shopping.

[1] Mr. Singh is issuing a Notice of Action in the Ontario Superior Court of Justice seeking, *inter alia*, a declaratory Order that the proper jurisdiction and forum for this matter is Ontario, Canada.





## 2. Factual Background[2]

Mr. Singh, a veteran of the technology and commercial real estate industry, would be dramatically harmed if Plaintiff's request for injunctive relief - filed nearly three months into a one year noncompete - is granted. While Plaintiff will retain the benefit of Mr. Singh's work and revelation of intimate details of his future software development and marketing plans made during an investment proposal requested by Plaintiff, Mr. Singh will be unable to work in the field in which he has been an active and productive inventor, entrepreneur, and employee for 16 years.

Prior to his employment with Plaintiff, Mr. Singh founded, built, and sold a real estate software company, Voyanta. Voyanta is a sophisticated commercial real estate data and analytics product incorporating workflow management capabilities, which was designed principally by Mr. Singh. Mr. Singh sold Voyanta in 2014, and in early 2017, intent on continuing to invent software solutions in the real estate field, Mr. Singh founded a new software company focused on enabling data, analytics, workflow, and collaboration requirements of institutional real estate investors through a new investor-focused software product (the "Singh Software"). In the spring of 2017, Mr. Singh was interviewing potential customers, and developing a detailed product prototype and strategic plan. Mr. Singh had made arrangements with beta customers and potential cofounders when he was approached by Plaintiff with an employment offer.

In July 2017, while on a trip to New York to meet with potential customers and investors, Mr. Singh met Mr. Borovsky to network and exchange views on real estate technology. During that meeting, Mr. Singh described, among other things, the Singh Software and his business plan for it. Based on representations made by Mssrs. Borovsky and Williams, Mr. Singh was led to believe that Plaintiff was close to becoming a highly successful real estate technology company and he could be instrumental in their efforts. After much coaxing, Mr. Singh agreed to set aside his attempts to commercialize the Singh Software at that time to work for Plaintiff. He dissolved his company and severed ties with beta customers and cofounders. Plaintiff did not purchase or license the Singh Software from Mr. Singh, as a condition of his employment or otherwise, and further development of the Singh Software was not contemplated by Mr. Singh's employment.

During his employment with Plaintiff, Mr. Singh developed software used by operators to aggregate data about their assets and report on performance - essentially the same product Mr. Singh had previously developed at Voyanta, but specific to the simpler requirements of Plaintiff's operating partners. This operator software is distinguishable from the investor-directed Singh Software, due to differences in target customers, feature sets, and overall product design,

---

[2] There are a number of factual inaccuracies in Plaintiff's pleadings regarding Mr. Singh's hiring, employment, resignation, and post-employment activities. While not an exhaustive list, Plaintiff mischaracterizes Mr. Singh's resignation as "abrupt," misrepresents an investment proposal provided at Mr. Williams' request as evidence of various admissions by Mr. Singh, includes false statements regarding a July meeting in which Mr. Singh allegedly described a plan to build software for owners and investors, and incorrectly suggests that Mr. Singh obtained documents from Plaintiff's employees under false pretenses. Each of these allegations is demonstrably false. In further pleadings, Mr. Singh will supply an affidavit supported by ample evidence disproving many of the statements which Plaintiff sets forth and to which its principals aver.





among others. At all times, it was clear that the operator software Mr. Singh began to develop for Plaintiff was not competitive with the Singh Software.

Upon joining Plaintiff, it quickly became clear that Mr. Singh had been misled. Plaintiff had not developed any material software and was not focused on software, and Mr. Singh's skills would not be well-utilized under Plaintiff's short or long term goals. Accordingly, in July 2018, Mr. Singh discussed with Mssrs. Borovsky and Williams the possibility of leaving Plaintiff to return to his pursuit of monetizing the Singh Software. After these discussions, Mr. Williams requested a proposal from Mr. Singh to discuss how Plaintiff might continue to work with Mr. Singh, for example, by Plaintiff investing in a separate business formed by Mr. Singh to further develop the Singh Software. Mr. Singh provided such a proposal tailored to Plaintiff's business model. While originally viewed by Mr. Singh as an interest in investment, it now appears that Plaintiff unscrupulously planned to use this presentation to obtain details of the Singh Software so that Plaintiff could replicate it and/or falsely claim that it competes with Plaintiff. At no time during the parties' discussions regarding Mr. Singh's potential departure and Plaintiff's potential investment in Mr. Singh's company did Plaintiff raise any concerns regarding intellectual property or potential competition. Indeed, Plaintiff's Exh. G, listing Plaintiff's strategy options for 2018-2020, makes no mention of ***any*** software.

**3. <u>Unenforceability of the IPIA</u>**

We now turn to the legal assertions of Plaintiff. First, Mr. Singh has confirmed to Plaintiff that he has, continues to, and will continue to comply with his contractual obligations to Plaintiff, and has destroyed all materials in his possession received or created while employed by Plaintiff. Plaintiff has not identified any materials in Mr. Singh's possession at this time which constitute or evidence any trade secret, confidential information, or proprietary materials of Plaintiff.

The IPIA itself is also unenforceable. Plaintiff's overbroad interpretation of competition as evidenced in the Complaint and TRO papers, to prevent Mr. Singh from working in the real estate or software development fields over an extraordinary geographic range and unlimited time period, is simply unenforceably overbroad. The IPIA is further overbroad in attempting to restrain activities related to Plaintiff's unnamed and undefined "anticipated business research and development," requiring assignment of anything "useful with or in or relate[d] directly or indirectly to any Company Interest," and defining Proprietary Information as all information "regarding or relevant to any Company Interest…." IPIA at §§ 2(a) & (b). Additionally, "[s]oftware for institutional owners of real estate" and "software for owners and investors in commercial real estate" would serve to capture practically any software product that could be developed for the real estate industry.

The effect of these provisions is to improperly allow Plaintiff to claim anything and everything considered or developed by an employee during or after his employment as its own, including any software, real estate, investing, borrowing, marketing, or other technology, information, or data, while preventing any competitive or non-competitive activities within the software or real estate industries throughout the world, forever. New York law refuses to enforce such overly broad and unduly burdensome restrictions. "A restrictive covenant against a former employee 'will be enforced only if reasonably limited temporally and geographically…, and then only to





the extent necessary to protect the employer from unfair competition which stems from the employee's use or disclosure of trade secrets or confidential customer lists.'" *IVI Envtl. v. McGovern*, 269 A.D.2d 497, 498 (2d Dep't 2000). As set forth herein, the Singh Software, which was developed prior to Mr. Singh's employment with Plaintiff, does not use any trade secret or confidential information of Plaintiff. Moreover, any general knowledge or "remembered information" Mr. Singh has based on his employment with Plaintiff and/or experience in the industry is not Plaintiff's confidential information. *See Anchor Alloys, Inc. v. Non-Ferrous Processing Corp.*, 39 A.D. 2d 504, 507-08 (2d Dep't 1972).

Furthermore, there is no competition between Plaintiff and Mr. Singh, as the Singh Software is a SaaS product directed at institutional real estate investors, while, according to its own self-description, Plaintiff is an investment platform that provides access to commercial real estate opportunities - an asset-finding, crowd-funding website. Plaintiff identifies real estate investment opportunities, and allows potential investors to browse such properties; it does not market software to customers, but only offers a platform to connect investors with opportunities.

In short, at the time Mr. Singh first became employed with Plaintiff, the Singh Software was fully conceived, and has remained unchanged throughout the course of Mr. Singh's employment. This is well known to Plaintiff, as Mr. Singh described the software to Mr. Borovsky in July 2017, prior to Plaintiff's solicitation of Mr. Singh for employment. At that time, Plaintiff was well aware that Mr. Singh already had a number of investors both identified and interested in the invention. Technology conceived of and already reduced to a prototype by Mr. Singh prior to his employment with Plaintiff cannot, by any means, be deemed to belong to or be owned by Plaintiff. IPIA at § 2(b); *see also Preston v. Marathon Oil Co*., 684 F.3d 1276, 1286 (Fed. Cir. 2012). On this point alone, any claims of ownership or competition based on the Singh Software raised by Plaintiff fail. The IPIA repeatedly identifies inventions or creations "during the term of [Mr. Singh's] employment" as the only intellectual property assigned to the Company.

**4. <u>Plaintiff Has Not Established a Trade Secret</u>**

While this dispute should properly be litigated in and under the laws of Ontario, Canada, under New York law, courts consider six factors to be relevant in deciding whether particular information is a trade secret. *See* TRO at 16. Here, Plaintiff's Complaint and TRO papers are indecipherably vague as to what confidential or proprietary information Plaintiff believes Mr. Singh retains or may use in the future. *See, e.g.,* Complaint, ¶ 48 ("Mr. Singh…breached the IPIA…by surreptitiously forwarding Cadre *documents and materials* to his own personal email account, including documents that contain *confidential and proprietary information*.") (emph. added); *id.* ¶ 69 ("Cadre has *an array of proprietary trade secret information*") (emph. added). In the absence of identification of any specific information owned by Plaintiff that Plaintiff alleges Mr. Singh possesses, Plaintiff cannot succeed on the merits of its claims.[3]

---

[3] Moreover, with respect to Plaintiff's claim under the Defend Trade Secret Act (DTSA), the conclusory allegations fail to provide the required specificity regarding what particular trade secrets have been taken. *See Sit-Up Ltd. v. IAC/InterActive Corp.,* 2008 WL 463884, *10 (S.D.N.Y. Feb. 20, 2008) ("the law requires the trade secret claimant to describe the secret with sufficient specificity that its protectability can be assessed.").

Certainly, Plaintiff cannot identify steps taken to guard the secrecy of information it fails to even identify. Plaintiff also fails to establish the amount of time, money and effort used in developing such information, or the economic value of the information based on Mr. Singh's alleged inevitable use. Put simply, there is no trade secret upon which Plaintiff may assert a claim. Under New York law, Plaintiff must show that (1) it possesses a trade secret and (2) defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means. *DoubleClick Inc. v. Henderson*, No. 116914/97, 1997 WL 731413 (N.Y. Sup. Ct. N.Y. Cnty. Nov. 7, 1997) (citing *Integrated Cash Mgmt. Serv., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 173 (2d Cir. 1990)). As indicated above, Plaintiff is not in possession of a trade secret, nor did Mr. Singh breach any agreement with Plaintiff.

**5. Plaintiff Is Not Likely to Succeed on the Merits**

Preliminary injunction is only appropriate if the movant shows: (1) likelihood of success on the merits; (2) likelihood of irreparable harm; (3) inadequate remedies available at law; and (4) that the public interest would not be disserved. *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010). The plaintiff must show a "real or immediate threat that the plaintiff will be wronged again." *Schroedel v. New York Univ. Med. Ctr.*, 885 F. Supp. 594, 598 (S.D.N.Y. 1995).

As indicated above, there is no likelihood of success on the merits with respect to any of Plaintiff's claims. Plaintiff cannot sustain a claim for breach of an unenforceable agreement or breach based on an invention already reduced to prototype and testing prior to employment, nor a violation of state or federal trade secret acts where Plaintiff cannot identify any trade secret purportedly misappropriated or used. The balance of hardships also do not tip in the Plaintiff's favor - just the opposite. Mr. Singh spent significant amounts of time, money and resources to develop the Singh Software, prior to his employment with Plaintiff. If an injunction were granted, it would only serve to seriously hinder Mr. Singh's economic interests, threatening his very livelihood as a 15-year veteran of the real estate and software development industries.

As to irreparable harm, "a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Reuters, Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990). A party can establish irreparable harm "if it shows that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation." *Rex Med. L.P. v. Angiotech Pharms. Inc.*, 754 F. Supp. 2d 616, 621 (S.D.N.Y. 2010). Here, Plaintiff can assert no potential irreparable harm, as it cannot identify any misappropriated information nor any potential use thereof, nor any competition between the parties. As Plaintiff cannot establish the elements for a preliminary injunction, and such relief would cause significant harm to Mr. Singh while denial of such would result, at most, in only monetary loss to Plaintiff, injunctive relief should be denied.

Respectfully submitted,

/s/ Lindsay F. Ditlow
Lindsay F. Ditlow